**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Robbin Shea Brown, | ) | No. CV 15-0328-TUC-FRZ (LAB) |
| | ) | |
| Petitioner, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| S. Lake, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Pending before the court is a petition for writ of habeas corpus pursuant to 28 U.S.C. 2241, filed on July 24, 2015.  (Doc. 1)  The petitioner, Robbin Shea Brown, challenges three separate disciplinary proceedings.

The respondent, S. Lake, filed an answer opposing the petition on October 1, 2015. (Doc. 13)  Brown filed a reply on October 16, 2015.  (Doc. 16)

Pursuant to the Rules of Practice of this Court, this matter was referred to Magistrate Judge Bowman for Report and Recommendation.  The petition should be denied on the merits.


Summary of the Case

On September 4, 2013, Brown was convicted in U.S. District Court of Possession with Intent to Distribute Marijuana and sentenced to a 60-month term of incarceration.   (Doc. 13-3, p. 2)  He is currently incarcerated at the Federal Correctional Institution (FCI) in Safford, Arizona.  (Doc. 13, p. 1)

1

Claim 1: Incident 2648356, Cleaning the Restroom

2      On November 6, 2014, Counselor Mondragon inspected the Cholla Unit and found

3  Brown asleep in bed.  (Doc. 13-3, p. 20)  Mondragon woke Brown and instructed him to clean

4  the Cholla C/D restroom.  *Id.*  When Brown replied that he didn't work in that bathroom,

5  Mondragon explained that all orderlies are responsible for keeping the unit clean.  *Id.*  Brown

6  did not clean the restroom as instructed, so Mondragon told another inmate to do the job.  *Id.*

7      Brown was charged with Refusing a Direct Order. (Doc. 13-3, p. 20)  When questioned

8  by the investigating officer, Brown conceded that he was awoken by staff and was told to clean

9  the restroom.  *Id.*, p. 21  He maintained, however, that he found the bathroom had already been

10  cleaned.  *Id.*

11      Brown later told the Unit Discipline Committee (UDC) that he did, in fact, clean the

12  bathroom. (Doc. 13-3, p. 20)  Moreover, he insisted that he cleaned the B and C bathrooms

13  along with the C/D bathroom and that the Unit Officer saw him clean.  *Id.*

14      The Disciplinary Hearing Officer (DHO) conducted a hearing on November 24, 2014.

15  (Doc. 13-3, p. 19)  Brown was represented by Senior Officer J. Bigler.  *Id.*  Brown conceded

16  that he was instructed to clean the restroom by Counselor Mondragon.  *Id.*  He stated he did not

17  clean the restroom immediately, but he went to the Lieutenant's office instead.  *Id.*  He insists

18  he cleaned the restroom when he returned to the unit.  *Id.*

19      The DHO considered witness statements taken at Brown's direction by his Staff

20  Representative.  (Doc. 13-3, p. 20)  The DHO did not permit the witnesses to testify in person

21  because their testimony would have been "repetitive."  *Id.*, p. 21  Moreover, none of them said

22  they saw Brown clean the restroom.  *Id.*

23      The DHO found Brown committed the prohibited act of Refusing a Direct Order based

24  on Mondragon' testimony, Brown's inconsistent statements, and Brown's history of poor work

25  performance.  (Doc. 13-3, pp. 20-21)  The DHO sanctioned Brown with a loss of 14 days of

26  good conduct time, among other things.  *Id.*, p. 21

27

28

Claim 2:  Incident 2712247, Insolence Toward Staff,

On May 5, 2015, at 11:55 AM, Brown attempted to use the commissary but found it closed. (Doc. 13-3, p. 74) He asked Lieutenant Hendrix why it was not open because it usually did not close until noon. *Id*. Hendrix called Mr. Truelove, who was working in the commissary. *Id*. Hendrix then explained to Brown that the commissary was closed due to computer problems. *Id*. He suggested Brown come back in the evening. *Id*. Brown replied that he could not come back in the evening because he had "call-outs." *Id*. Brown stated he wanted to talk to the Captain, but Hendrix instructed Brown to come to his office. *Id*. Brown asserted, "The computers aren't down; they are lying." *Id*. When Hendrix instructed Brown to lower his voice, Brown replied, "Or what?" (Doc. 13-3, p. 75) Hendrix then placed Brown in a holding cell "and conducted a visual search" because Brown "had what appeared to be a lot of items in [his] pants pockets." *Id*. Hendrix told Brown he was going to place him in SHU (special housing unit) for making a threat towards a staff member. *Id*. Brown said, "You're a fucking idiot and a coward." *Id*.

Brown was charged with Threatening with Bodily Harm/Insolence Towards Staff. (Doc. 13-3, p. 81) The DHO conducted a hearing on May 14, 2015. *Id*., p. 73

Brown testified that he told Hendrix, "The computers aren't down, you can hear them working." (Doc. 13-3, p. 73) He said he did not remember saying Hendrix was lying, but it is possible he said that. *Id*. He conceded that when Hendrix told him to not go over his head and respect his answers, he told Hendrix, "Or what?" *Id*. Brown maintained he was agitated but not aggressive. *Id*. He testified Hendrix escorted him to a holding cell and conducted a visual search. *Id*. He stated he did not say, "You're a fucking idiot and a coward." *Id*. Instead, he said, "Why are you screaming and waiving your hands millimeters from my face; is it because you're a bully, or a coward who is scared to hit me?" *Id*.

The DHO found Brown committed the act of Insolence Towards Staff based on Hendrix's testimony and the testimony of SIS (special investigation supervisors) Technicians Gonzales and Delgado, who both witnessed Brown say to Hendrix, "You're a fucking idiot and a coward." (Doc. 13-3, p. 76) The DHO sanctioned Brown with a loss of 14 days of good conduct time, among other things. *Id*.

1

2       Claim 3:  Incident 2719109, Religious Medallion

3              On May 2, 2015, Officer J. Clifford was supervising inmate movement when he ordered

4       Brown to tuck his religious medal under his shirt.  (Doc. 13-3, pp. 123-124, 135)  Brown

5       responded, "You can't tell me what to do, base[d] [on] your religious preference." *Id*., p. 124

6       Clifford stated that "it is policy for inmates to keep religious medallions under their shirts while

7       not in a religious service." *Id*.  Later that day, Clifford gave Brown a copy of the regulation that

8       explains, "All religious medallions will be worn inside the shirt except during services." *Id*.,

9       (citing FCI Safford's Institutional Supplement, SAF 5360.09F)

10             On May 25, 2015, Senior Officer M. Espinoza was assisting with the 4:00 PM count

11      when he noticed Brown was wearing his medallion outside of his shirt.  (Doc. 13-3, p. 133)  He

12      confiscated the medallion because Brown had been told earlier that he could not display the

13      medallion outside of his shirt.  *Id*.  In fact, this was not the first time the medallion was

14      confiscated because Brown had worn it over his shirt.  *Id*.

15             Brown was charged with Refusing to Obey an Order. (Doc. 13-3, p. 133)  Brown told

16      the investigating Lieutenant, "I just woke up for count, and did not know it was outside my

17      shirt." *Id*., p. 123  He told the UDC (Unit Discipline Committee) , "He never gave me an order

18      and just took my necklace." *Id*.

19              The DHO conducted a hearing on June 26, 2015.  (Doc. 13-3, p. 122)  Brown submitted

20      witness statements that Espinoza ordered Brown to surrender his medallion without prior

21      explanation. *Id*., p. 123

22             The DHO found Brown committed the act of Refusing to Obey an Order of a Staff

23      Member. (Doc. 13-3, p. 124)  He rejected Brown's argument that he just woke up, and his

24      clothing was in disarray.  *Id*.  He explained that inmates know when count time is and must be

25      presentable at that time.  *Id*.  The DHO rejected the witnesses' statements as irrelevant because

26      they seem to have been submitted to prove that Espinoza did not give Brown an order just prior

27      to confiscating the medallion on May 25th , and therefore Brown could not have committed the

28      act of Refusing to Obey an Order.  *Id*.  In fact, the order Brown disobeyed was given to him

1 earlier, on May 2nd, when Clifford first showed him the regulation that requires religious

2 medallions to be worn inside the shirt except during services. *Id.*

3       The DHO sanctioned Brown with the loss of 45 days of good conduct time, among other

4 things. (Doc. 13-3, p. 124)

5

6       <u>Procedural History</u>

7       On July 24, 2015, Brown filed in this court a petition for writ of habeas corpus pursuant

8 to 28 U.S.C. 2241 challenging these three disciplinary actions. (Doc. 1) Regarding the '356

9 incident, Brown argues the evidence presented was insufficient, and the DHO improperly

10 refused to admit his witnesses violating BOP rules. *Id.* Regarding the '247 incident, Brown

11 argues Hendrix lied and manipulated the system to place the incident before a DHO rather than

12 a UDC. *Id.* Regarding the '109 incident, Brown argues the rule requiring religious medallions

13 to be worn under the shirt is a violation of RFRA (the Religious Freedom Restoration Act of

14 1993) and RLUIPA (the Religious Land Use and Institutionalized Persons Act of 2000). Brown

15 concedes he has not exhausted all of his administrative appeals. He argues, however, that this

16 is because his appeals are not being adjudicated in a timely manner.

17       The respondent filed an answer arguing the petition should be dismissed for failure to

18 exhaust administrative remedies. (Doc. 13) In the alternative, the respondent argues all claims

19 should be denied on the merits. *Id.*

20       Brown filed a reply on October 16, 2015. (Doc. 15) The court finds that the petition

21 should be denied on the merits. The court expresses no opinion on the respondent's alternative

22 arguments.

23

24       <u>Discussion</u>

25       "Lawful imprisonment necessarily makes unavailable many rights and privileges of the

26 ordinary citizen." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). Nevertheless, prisoners do

27 retain some constitutional rights concerning the procedures for administering prison discipline.

28

1    *Id.* These rights are not as extensive as those due a defendant in a criminal proceeding, but they

2    are not negligible. *Id.*

3    "Due process in a prison disciplinary hearing is satisfied if the inmate receives written

4    notice of the charges, and a statement of the evidence relied on by the prison officials and the

5    reasons for disciplinary action." *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987), *cert.*

6    *denied*, 487 U.S. 1207 (1988). "The inmate has a limited right to call witnesses and to present

7    documentary evidence when permitting him to do so would not unduly threaten institutional

8    safety and goals." *Id.*

9    The final decision to revoke good time credits must be based on "some evidence."

10   *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "The relevant question is whether there is any

11   evidence in the record that could support the conclusion reached by the disciplinary board."

12   *Id.* at 455-56. If so, then due process is satisfied. *Id.* The court need not examine the entire

13   record, independently assess the credibility of the witnesses, or weigh the evidence. *Id.* at 455.

14   Regarding incident '356, Brown claims first that the evidence presented was insufficient

15   to find he committed the prohibited act of Refusing a Direct Order. He is incorrect. The DHO

16   found Brown refused an order to clean the C/D restroom based on the testimony of Mondragon,

17   his inconsistent statements, and his history of poor work performance. (Doc., 13-3, pp. 20-21)

18   The DHO's decision was based on "some evidence." That is enough.

19   Brown argues there was no *direct* evidence presented against him, and the DHO's

20   decision was based on circumstantial evidence only. That does not matter. As long as the

21   DHO's decision was based on "some evidence," due process was satisfied.

22   Brown further argues the DHO improperly refused to allow his witnesses to testify in

23   person violating BOP rules. Here, the DHO considered witness statements taken at Brown's

24   direction by his staff representative. (Doc. 13-3, p. 20) The DHO did not permit the witnesses

25   to testify in person, however, because their testimony would not have been particularly relevant

26   and would have been "repetitive." *Id.*, pp. 20, 21  Some of the witnesses heard Mondragon

27   order Brown to clean the restroom. *Id.* Some heard Brown complain about Mondragon. *Id.*

28   None of them saw Brown clean the restroom. *Id.*, p. 21

1    The DHO's failure to call Brown's witnesses to testify in person did not violate his due

2 process rights.  The due process right to call witnesses at a disciplinary hearing is a right

3 circumscribed by the prison's need to provide a timely and prudent disciplinary system.  *Ponte*

4 *v. Real*, 471 U.S. 491, 495, 105 S. Ct. 2192, 2195 (1985).  Here, the DHO properly balanced

5 Brown's desire for live witnesses with the evidentiary value of the expected testimony.  His

6 decision to admit the witnesses statements but not the live testimony was proper.

7 *See Pannell v. McBride*, 306 F.3d 499, 503 (7th Cir. 2002)  ("[P]risoners do not have the right

8 to call witnesses whose testimony would be irrelevant, repetitive, or unnecessary.").

9    Brown further argues the DHO's decision violated BOP policy 5270.09(f).  (Doc. 15, p.

10 1);  *see also* 28 C.F.R. § 541.8(f)(3).  He states this policy only permits the exclusion of

11 witnesses if they are not available, there are security concerns, or the evidence would be

12 repetitive.  *Id.*  He asserts "[n]one of those factors [were] given by DHO Kane."  *Id.*  Brown is

13 incorrect. The DHO explicitly stated that the witnesses' testimony would be "repetitive." (Doc.

14 13-3, pp. 20-21);  *see also Armstrong v. Warden of USP Atwater*,  2011 WL 2553266, *8

15 (E.D.Cal. 2011)  ("A violation of a BOP regulation, without more, is not a constitutional

16 violation.").  The DHO acted in accordance with BOP policy when he chose to admit the

17 witnesses' statements instead of permitting them to testify in person.

18    Regarding the '247 incident, Brown claims Hendrix lied and manipulated the system to

19 place the incident before a DHO (Disciplinary Hearing Officer) rather than a UDC (Unit

20 Disciplinary Committee). (Doc. 1)  He further argues that if his charge remained with the UDC

21 he would not have lost good time credits.  *Id.*

22    Brown's argument is not entirely clear.  All disciplinary incidents are first screened by

23 the UDC.  They are referred to a DHO based on the "seriousness" of the prohibited act.  28

24 C.F.R. § 541.7(a)(3).  Brown was charged with the acts Threatening with Bodily Harm and

25 Insolence Towards Staff. (Doc. 13-3, p. 81)  Threatening with Bodily Harm is a High Severity

26 Act, and all High Severity Acts are automatically referred to a DHO.  28 C.F.R. §§ 541.3;

27 541.7(a)(4).  Insolence Toward Staff is only a Moderate Severity Act and could be adjudicated

28

by the UDC.  *Id*.  The UDC cannot impose a penalty of loss of good time credits.  28 U.S.C. § 541.7.

Brown seems to be arguing that if Hendrix had not lied about feeling threatened, the incident would have been charged only as Insolence Toward Staff and would not have been referred to the DHO.  The court does not agree with Brown's logic.  Insolence Toward Staff is only a Moderate Severity Act, and therefore referral to the DHO is not *mandatory*.  28 C.F.R. §§ 541.3; 541.7(a)(4).  Nevertheless, referral to the DHO still could be made based on the seriousness of the incident.  28 C.F.R. § 541.7(a)(3).  And here, Brown's insolence was fairly serious.  Apart from Brown's speculation, there is nothing to indicate that things would have been different had the incident been charged only as "Insolence Toward Staff."

Brown further argues the evidence was insufficient to prove he committed the prohibited act "Insolence Toward Staff."  Here, the DHO found Brown committed the prohibited act based on the testimony of Hendrix and the SIS Technicians Gonzales and Delgado, who all witnessed Brown say to Hendrix, "You're a fucking idiot and a coward."  (Doc. 13-, p. 76)  There was "some evidence" to support the decision of the DHO.  Brown's due process rights were not violated.

Regarding incident '109, Brown argues the rule requiring him to wear his religious medallion inside his shirt violates RFRA, the Religious Freedom Restoration Act of 1993, and RLUIPA, the Religious Land Use and Institutionalized Persons Act of 2000.  In response to his administrative appeal, the Warden explained that "[t]his is for the security, safety, and good order of the institution."  (Doc. 1, pp. 6, 27)

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty."  *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).  RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability."  *Id*. at 2761.  "RLUIPA essentially reinstitutes the demanding RFRA standard of review for intrusions on religious liberty in the limited contexts of prisoners and federal land."  *Walker v. Beard*, 789 F.3d 1125, 1134 (9th Cir. 2015).

RLUIPA reads in pertinent part as follows:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.

"RLUIPA defines a religious exercise to include any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Walker v. Beard*, 789 F.3d 1125, 1134 (9th Cir. 2015) (punctuation modified). "The definition is intentionally broad." *Id.* "It covers not only belief and profession but the performance of physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine." *Id.* (punctuation modified).

"To constitute a substantial burden, a limitation of religious practice must impose a significantly great restriction or onus upon such exercise." *Id.* (punctuation modified) "A substantial burden need not actually force a litigant to change his practices; a violation may occur where the [government] denies an important benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (punctuation modified)

Brown identifies his faith as Odinist/Asatru. (Doc. 1, p. 6) He explains he is required to follow the Nine Noble Virtues and wearing his Thor's hammer medallion wards off the forces of chaos. *Id.* He asserts, "I believe if I hide my hammer, I am omitting my religion, my faith, may fidelity to MY GODS." (Doc. 15, p. 4) (emphasis in original)

FCI Safford has a rule, SAF5360.09F, stating as follows: "Each religion is authorized its sacred book and a religious medallion (No more than 2 inches in diameter) with chain (not to exceed 24 inches in length)." (Doc. 13-3, pp. 124, 140) "All religious medallions will be worn *inside the shirt except during services*." *Id.* (emphasis added) It is this last requirement that is the crux of the case here. Assuming without deciding that the BOP's policy substantially

1  burdens Brown's religious exercise, the court finds that policy is the "least restrictive means of
2  furthering a compelling governmental interest." *Id.*

3      The Warden explained to Brown that the rule advances the "security, safety, and good
4  order of the institution." (Doc. 1, pp. 6, 27)  Prison security is a compelling state interest for
5  the purposes of RLUIPA. *Warsoldier v. Woodford*, 418 F.3d 989, 998 (9th Cir. 2005).  Allowing
6  prisoners to possess religious medallions could compromise security.  The possession of jewelry
7  in general could encourage theft.  And the possession of  religious medallions could be even
8  more problematic.  The medallions could be used by gangs as indicia of membership. *Charles*
9  *v. Frank*, 2004 WL 1303403 (7th Cir. 2004)  (unpublished).  Moreover, the medallions could
10 trigger animosity in other prisoners who do not welcome the message they believe, rightly or
11 wrongly, is conveyed by the medallion.  *See, e.g., Borzych v. Frank*, 2005 WL 2206785, at *6
12 (W.D. Wis. 2005)  ([A]mong the signs that are readily recognized by inmates as associated with
13 white supremacy are depictions of Thor's hammer. . . .").

14      Forbidding all religious medallions would further the government's interest in safety and
15 security, but such a rule might not be the least restrictive means of furthering that interest.
16 Accordingly, the BOP has fashioned a rule that permits inmates to possess religious medallions
17 but requires them to wear their medallions inside the shirt except during services.  It is the least
18 restrictive means of furthering the prison's interest in security, safety, and good order. *See, e.g.,*
19 *Charles v. Frank*, 2004 WL 1303403 (7th Cir. 2004)  (unpublished)  (Policy that required
20 Muslim prisoner to wear prayer beads under his shirt when he was not in his cell satisfied
21 RLUIPA.); *Jihad v. Fabian*, 680 F. Supp. 2d 1021, 1027-28 (D. Minn. 2010)  ("Furthermore,
22 even if a substantial burden existed, the compelling interest of prison safety and security justify
23 these narrowly-tailored regulations, which prohibit the display of the Kufi and medallion
24 outside of an inmate's cell, but allow an inmate to freely wear these items within his cell.").

25

26      RECOMMENDATION

27

28

1    The Magistrate Judge recommends that the District Court, after its independent review
2    of the record, enter an order denying the petition for writ of habeas corpus filed on July 24, 2015
3    on the merits.  (Doc. 1)
4        Pursuant to 28 U.S.C. §636 (b), any party may serve and file written objections within
5    14 days of being served with a copy of this Report and Recommendation.  If objections are not
6    timely filed, they may be deemed waived.  The Local Rules permit a response to an objection.
7    They do not permit a reply to a response.
8        DATED this 10th day of December, 2015.

Leslie A. Bowman

Leslie A. Bowman
United States Magistrate Judge